UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
DONALD GEORGE BROWN,

                    Petitioner,

      -against-

UNITED STATES OF AMERICA,

                    Respondent.
-----------------------------------------------------X

**MEMORANDUM & ORDER**

03 CV 3909 (RJD)

-----------------------------------------------------X
DERRICK RILEY,

                    Petitioner,

      -against-

UNITED STATES OF AMERICA,

                    Respondent.
-----------------------------------------------------X

**MEMORANDUM & ORDER**

03 CV 4371 (RJD)

DEARIE, Chief Judge.

     Following a seven-week jury trial on a 42-count superseding indictment, the government

established Derrick Riley's responsibility for a host of serious criminal acts, including conspiracy,

racketeering, murder, money laundering and weapons offenses, as well as the running of a

"continuing criminal enterprise" under 21 U.S.C. § 848, all committed in his role as leader of the

violent Brooklyn drug gang dubbed the "Nineties Posse."  For most of those same crimes, the

government also established the guilt of trial co-defendant Donald George Brown, a member of the

posse.[1]  Together, petitioners were found responsible for six murders.

The judgments of conviction, entered on April 26, 1999 (Brown) and December 16, 1999 (Riley), were affirmed by the Second Circuit in a summary order.  United States v. Brown, Nos. 99-1230 (L), 99-1762, 2002 WL 34244994 (2d Cir. April 26, 2002).[2]  The Supreme Court denied certiorari.  Riley v. United States, 537 U.S. 933 (Oct. 7, 2002) (No. 02-5847); Brown v. United States, 537 U.S. 913 (Oct 7, 2002) (No. 02-5402).

Now serving multiple life sentences,[3] Brown and Riley each seek to vacate their convictions under 28 U.S.C. §2255.  Although not formally consolidated, the two petitions raise nearly identical claims and are both denied for the reasons set forth in this single Memorandum and Order.

## I.      STANDARDS FOR RELIEF UNDER 28 U.S.C. §2255

To obtain collateral relief under 28 U.S.C. § 2255, a petitioner must show that his "sentence was imposed in violation of the Constitution or laws of the United States."  28 U.S.C. § 2255.  Relief is usually available under 28 U.S.C. § 2255 "only for a constitutional error, a lack

---

[1]  The counts of conviction are not identical. For example, as a member but not leader of the posse, Brown was not charged in the CCE count; one of Riley's convictions is for being an accessory to one of Brown's murders in aid of racketeering; and with respect to the five counts charging both Brown and Riley with participation in a double-murder (Counts 22 through 26), the jury did not reach a verdict as to Riley and acquitted Brown.

[2]  The Court vacated the convictions under Count 32 for narcotics conspiracy upon the government's concession that it was a lesser included offense of the CCE count.  Brown, 2002 WL 34244994 at *2.   That count was formally dismissed by this Court's order dated July 1, 2002.

[3]  Riley received five life sentences (one each for racketeering, racketeering conspiracy, two counts of murder in aid of racketeering, and the CCE count), to run concurrently, and lesser terms (some concurrent and some consecutive terms) on the remaining counts.   Brown received eight concurrent life terms (one each for racketeering, racketeering conspiracy, and six counts of murder in aid of racketeering), plus lesser consecutive and concurrent terms on the remaining counts.

of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice." Cuoco v. United States, 208 F.3d 27, 30 (2d Cir. 2000) (internal quotations and citations marks omitted). Even where constitutional error is found, a petitioner is not entitled to relief under 2255 unless that error had a "substantial and injurious effect" on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 623 (1993). See Underwood v. United States, 166 F.3d 84, 87 (2d Cir.1999) (Brecht standard applies to § 2255 petition). Further, Brecht reaffirms that "the writ of habeas corpus has historically been regarded as an extraordinary remedy, a bulwark against convictions that violate fundamental fairness," and that "[t]hose few who are ultimately successful [in obtaining habeas relief] are persons whom society has grievously wronged and for whom belated liberation is little enough compensation." Id., 507 U.S. at 633-34 (internal quotations and citations omitted).

The authority to grant relief under section 2255 is to be exercised sparingly, for such applications "are in 'tension with society's strong interest in the finality of criminal convictions.'" Elize v. United States, 2008 WL 4425286, *5 (E.D.N.Y. Sept. 30, 2008) (NGG) (internal citations omitted). Indeed, it is because of this interest that "'the courts have established rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack.'" Id. (internal Supreme Court citations omitted).

These rules, principally procedural, render only a limited category of claims even cognizable on 2255. First, "[i]t is well established that a § 2255 petition cannot be used to 'relitigate questions which [sic] were raised and considered on direct appeal.'" United States v. Pitcher, 559 F.3d 120, 123 (2d Cir. 2009) (internal quotation marks and citation omitted). Likewise, section 2255 may not be used to challenge the legality of matters that were not first raised on direct appeal. United States v. Frady, 456 U.S. 152, 165 (1982); Zhang v. United States,

3

506 F.3d 162, 166 (2d Cir. 2007); United States v. Pipitone, 67 F.3d 34, 38 (2d Cir. 1995); Elize,

2008 WL 4425286 at *5 ("[c]laims raised in a § 2255 petition that could have been raised on direct

appeal [but were not] are . . . deemed procedurally defaulted and are not considered on collateral

review").

"Where a defendant has procedurally defaulted a claim by failing to raise it on direct

review, the claim may be raised in habeas only if the defendant can first demonstrate either cause

and actual prejudice, or that he is actually innocent." Bousley v. United States, 523 U.S. 614, 622

(1998) (citing, inter alia, Wainwright v. Sykes, 433 U.S. 72 (1977) (internal quotations omitted)).

See also Coleman v. Thompson, 501 U.S. 722, 748-50 (1991) (habeas petitioner must show both

cause for the default and actual prejudice, or that failure to consider the claim would result in a

miscarriage of justice); Murray v. Carrier, 477 U.S. 478, 496 (1986) ("miscarriage of justice"

exists if alleged constitutional error "probably resulted in the conviction of one who is actually

innocent").

Claims of ineffective assistance of counsel, however, are exempt from the procedural

default rule and "may be brought in a collateral proceeding under § 2255 whether or not the

petitioner could have raised the claim on direct appeal." Massaro v. United States, 538 U.S. 500,

504 (2003).

## II.  LAY OPINION CLAIM

Petitioners claim that this Court erred when it allowed prosecution witnesses to testify,

over the defense objections, as to their interpretations of what certain speakers were saying in

tape-recorded conversation to which they themselves were not parties.  They claim this occurred

three times during the trial: (i) when Special Agent Bland testified as to his understanding of what

certain terms meant in conversations between cooperator Dennis Tucker and Brown, and between

Tucker and others; (Tr. 403 et seq.); (ii) when Special Agent **Billivan** Johnson (the undercover) testified as to his understanding of portions of the recorded conversations between cooperator Tucker and co-defendant Riley (Tr. 898-927); and (iii) the testimony of cooperating accomplice Bertram Bucknor (Riley's driver) about the meaning of certain words used in recorded conversations between a "Randy" and "one of the Spanish guys" and between "Randy and Don One." (Tr. 2540, 2560 et seq.). Petitioners further claim that the Court denied the defense the same latitude by sustaining the government's objection when defense counsel sought to question their own witness, Dr. John Roy, about the meaning of terms in conversations to which he (Roy) was not a party, but which he had translated from the original Jamaican patois. (Tr. 4332-34).

The government argues, petitioners concede, and this Court's review of the appellate record confirms that these exact claims were raised on petitioners' consolidated direct appeal, see 2001 WL 34119494 at 91-92 (Brown's Appellate Brief), 2001 WL 34119492 at 25 (Riley's Appellate Brief), and rejected without elaboration by the Second Circuit. Brown, 2002 WL 34244994 at *6 ("We have considered appellants' remaining contentions relating to, *inter alia*, the District Court's evidentiary rulings . . . and find them to be without merit"). Petitioners' assertion of the same claim here, therefore, represents one of the long-prohibited abuses of section 2255, i.e., an attempt to reargue their direct appeal. Pitcher, 559 F.3d at 123.

Petitioners argue that they are nevertheless entitled to relitigate their lay opinion claim because United States v. Glenn, 312 F.3d 58, 66-67 (2d Cir. 2002), issued not long after their convictions each became final, is an "intervening change in substantive law" within the meaning of Davis v. United States, 417 U.S. 333, 334 (1974).[4] No matter how liberally construed,

---

[4] Petitioners' convictions became final on October 7, 2002 when the Supreme Court denied their petitions for certiorari; Glenn was decided on November 14, 2002.

however, the Glenn decision unquestionably does *not* announce new lay opinion law.

Petitioners no doubt rely on Glenn merely because the Circuit's opinion expresses agreement with the appellant's claim there that the trial court had improperly admitted certain testimony as a lay opinion under Federal Rule of Evidence 701. The facts made for an easy appellate call—a cooperator had testified that, based on his general knowledge of how drug dealers typically conduct themselves, a small bulge in the defendant's jacket, viewed from a distance, was probably a handgun. The Court therefore had only to reiterate the fundamental distinction between lay opinions admissible under Rule 701, which "must be 'rationally based on the perception of the witness,'" Glenn, 312 F.3d at 67 (quoting Fed.R.Evid. 701(a), and the opinions of persons who must be "'*qualified as an expert* by knowledge, skill, experience, training, or education'" under Rule 702. Id. (quoting Fed. R. Evid. 702) (emphasis added). Unequivocally relying on existing Circuit authority, i.e., United States v. Rea, 958 F.2d 1206, 1215 (2d Cir.1992), rather than endeavoring to announce a new rule, Glenn described Rule 701's "rational perception" requirement as "the *familiar* requirement of first-hand knowledge or observation." Id. (internal citations omitted).

Additionally, Glenn's discussion of lay opinion testimony could not be the announcement of a new rule because the Court reversed the conviction there on the grounds of insufficient evidence and openly discounted its lay opinion analysis as non-binding. Id. at 60 (because of the ruling on sufficiency, "[w]e . . . do not definitively resolve the lay-opinion contentions").

In sum, because the Second Circuit has already rejected petitioners' lay opinion claim and because Glenn is not an intervening change in the law that would permit re-litigation of that claim, petitioners' challenge to the lay opinion rulings at their trial is barred from review in this §2255 proceeding.

In any event, there is no error even under Glenn for each of the challenged witnesses had sufficient "first-hand knowledge" of the matters upon which he opined to satisfy 701's admissibility standard. As the Court observed during trial, Agent Bland was "the programmer of Dennis Tucker," Tucker was "following the script laid out by" Bland and so "analytically, Mr. Bland [wa]s the alter ego of Mr. Tucker." (Tr. 409). Agent Johnson, this Court likewise determined, "has[d] the requisite familiarity with this overall investigation, the conversations, and the events that are the focus of these conversations [on which] to base an opinion" for Rule 701 purposes concerning the meaning of certain recorded speakers' words. (Tr. 904-05). Bucknor, testifying as an accomplice, likewise had sufficient first-hand knowledge. (Tr. 2540).[5] In short, each offered an appropriately "lay" opinion within the meaning of 701 because it was based on his own knowledge of the particular facts and persons involved in the case, not, as troubled the panel in Glenn, on the basis of "specialized knowledge" about a "field"—such as the typical habits or codes of drug transactions—which would require qualification as an expert under Rule 702.

As for petitioners' challenge to this Court's sustaining of the government's objection to a portion of defense witness Dr. Roy, the ruling does not even present a possible Glenn problem. The questions to which the government objected were those that asked Dr. Roy about matters of

---

[5] The defense objected when the government asked Bucknor to identify the speakers in a particular conversation during which the speakers themselves did not use their names. The Court allowed Bucknor to answer inquiring as follows:

> Court: You don't recognize the voice?
> Bucknor: Yes.
> Court: You do recognize the voice?
> Witness: Yes.
> Court: Do you know the specific individual?
> Witness: Yes?
> Court: Do you know his name?
> Witness: No, but I spoke to him. (Tr. 2539-40)

grammar (including pronouns, subjects and objects of verbs); the Court sustained the objections not out of any concerns with the degree of Dr. Roy's first-hand knowledge but because the questions were posed in a fashion that was confusing and thus would not have elicited testimony helpful to the jury.

Any conceivable alternative view that saw possible error in the rulings would still not trigger 2255 relief because any such error would not be "*constitutional* error . . . or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice." Cuoco v. United States, 208 F.3d at 30 (emphasis added) (internal citations and quotation marks omitted).    Any such error would also be harmless because the Court repeatedly instructed the jurors that it was *their* interpretation that governed.    For example, when overruling the objection to Bland's opinion, the Court told the jury:

> Again, I would remind you this is an interpretation o[f] the witness'
> opinion based upon the information he described at the outset of this
> inquiry as to the meaning of certain terms that are being used.
> Ultimately, it will be for you to determine whether or not this
> interpretation is in whole or in part correct and otherwise consistent
> with the evidence that you've heard. (Tr. 351).

Later during Bland's testimony, the Court expanded upon the instruction:

> This is his interpretation.    It may or may not be consistent with the
> interpretation or the intent of the speaker or the meaning intended by the
> speaker who is speaking, whether the words are attributed to Mr. Tucker
> Or whether the words are attributed to Mr. Brown.    You should
> understand that.
>
> It will be you, your responsibility as factfinders here, to consider the
> testimony of the witness. Perhaps in light of the evidence in the case
> perhaps in light of the conversation as a whole and the context provided,
> you will agree or disagree with the interpretation provided by this
> witness or any other witness who is asked to comment upon what is his
> understanding of the meaning of a particular word or phrase intended.

(Tr. 411-12).

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

In nearly identical factual assertions, both petitioners now claim that their Court-appointed trial attorneys (veteran federal practitioners Lawrence Stern, for Brown, and Lee Ginsberg, for Riley) so mishandled the defense of the case that they were "not [even] functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." Strickland v. Washington, 466 U.S. 668, 687 (1984). They are plainly wrong.

### A. Controlling Standards

The standards for constitutional ineffectiveness claims are familiar, well established, and "rigorous." Parisi v. United States, 529 F.3d 134, 140 (2d Cir. 2008) (internal citation omitted). Under controlling Supreme Court authority, to show that the performance of trial or appellate counsel deprived them of their Sixth Amendment rights, petitioners bear a considerable burden:

> First, [they] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable.

Strickland v. Washington, 466 U.S. 668, 687 (1984). See also Henry v. Poole, 409 F.3d 48, 58 (2d Cir. 2005) ("The Federal test for evaluating ineffective assistance of counsel claims is set forth in *Strickland*").

In reviewing the record for ineffectiveness, this Court must be "highly deferential" to counsel's performance, since "'it is all too easy for a court, examining counsel's [performance] after it has proved unsuccessful, to conclude that a particular act or omission . . . was

9

unreasonable.'" Pratt v. Greiner, 306 F.3d 1190, 1196 (2d Cir. 2002) (quoting Strickland, 466

U.S. at 689). Indeed, as the Supreme Court has had occasion to reaffirm,

> Ineffective-assistance-of-counsel claims will be raised only in those
> cases where a defendant has been found guilty of the offense charged,
> and from the perspective of hindsight there is a natural tendency to
> speculate as to whether a different trial strategy might have been more
> successful. We adopted the rule of contemporary assessment of
> counsel's conduct because a more rigid requirement "could dampen the
> ardor and impair the independence of defense counsel, discourage the
> acceptance of assigned cases, and undermine the trust between attorney
> and client.

Lockhart v. Fretwell, 506 U.S. 364, 372 (1993).

The critical inquiry under the performance prong is "whether counsel's assistance was

reasonable considering all the circumstances." Strickland, 466 U.S. at 688. Acts or omissions of

counsel are considered "objectively unreasonable only if there was no tactical justification for the

course taken." Lynn v. Bliden, 443 F.3d 238, 247 (2d Cir. 2006) (internal quotations and citation

omitted), cert. denied, 549 U.S. 1257 (2007). When reviewing counsel's performance, the Court

must begin with the principle that "strategic choices made after thorough investigation of law and

facts relevant to plausible options are virtually unchallengeable." Strickland, 466 U.S. at 690.

As required, the Court must also "indulge a strong presumption that counsel's conduct falls within

the range of reasonable professional assistance," and "eliminate the distorting effects of

hindsight." Id. at 689.

To satisfy the prejudice prong of Strickland, petitioners must do more than merely show

that the challenged conduct of counsel had "some conceivable effect" on the trial's outcome. Id.,

466 U.S. at 693. Instead, they must show "a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." Id. at 694. A

"reasonable probability" is "a probability sufficient to undermine confidence in the outcome." Id.

10

The "rule of contemporary assessment" applied to counsel's **conduct**, however, does not apply to prejudice analysis; as the Supreme Court explained,

> the "prejudice" component of the Strickland test does not implicate the [same] concerns. It focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair. . . .Unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him.

Lockhart, 506 U.S. at 372 (internal citations omitted).

Lastly, "there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." Strickland, 466 U.S. at 697. This is hardly a minor feature of ineffectiveness jurisprudence:

> In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.

Id.

## B. **Discussion**

Under the foregoing standards, the Court's obligation in this proceeding is to dispose of petitioners' ineffectiveness claim on the ground of lack of prejudice, for none of the alleged deficiencies of counsel "deprive[d] [petitioners] of any substantive or procedural right to which the law entitles [them]," Lockhart, 506 U.S. at 372, or caused "a breakdown in the adversary process

that renders the result unreliable." Strickland, 466 U.S. at 687. The Court's view on the matter could hardly be more certain: the Court has already heard and denied a nearly identical claim, involving all but one of the alleged deficiencies raised in the 2255 papers, in the petitioners' several new trial motions briefed and decided in 1999, while their direct appeal was pending. Petitioners concede the identity of issues. See Riley Pet'n at 6 ("[t]he claims discussed in ¶12B(i)-(vi) . . . were raised by sentencing counsel in a motion for new trial based on assertions of ineffective assistance of counsel"). With respect to the previously asserted ineffectiveness allegations, petitioners have offered no new or overlooked fact or law and so are no more entitled to relief now, under Section 2255, than they were at the Rule 33 juncture on the basis of those allegations. Nevertheless, for petitioners' sake and in the interest of reaching utmost closure at the district court level, the Court addresses the ineffectiveness particulars on their merits, both those recast now under 2255 and the single allegation raised now for the first time. In the same spirit, the Court also resolves any doubt about the pro se submissions' content in the pro se petitioners' favor, and assumes for purposes of evaluating the several allegations that each petitioner has fully joined in the other's application.[6] So attributed, and construed liberally, the ineffectiveness claim before the Court alleges the following distinct shortcomings on the part of defense counsel:

    1. Petitioners complain that an exculpatory statement made by Sandra Jackson to the police and furnished to counsel was not introduced at trial. Jackson told police that she was at the Oasis Bar on the night Mark Walters was murdered, and that "the bar was very crowded when [she] s[aw] this guy Ratti reach over a group of people and start to shoot this other guy also known

---

[6] The one material exception is that Riley, but not Brown, also challenges the effectiveness of his appellate counsel.

as Ratti, he shoots him 3, 4 maybe more, I'm not sure. . .." See Report of Det. Wm. Daily, 2/28/94, at 1. (There was apparently no dispute that the victim Mark Walters was also known as Ratti and that an individual known as Wayne "Ratti" Walters was the other "Ratti" whom Jackson's statement identifies as the killer). Jackson further told police that "Ratti (Shooter) [was] known to her for many years from the neighborhood." Id. at 2. The police report further states that Jackson later viewed a photo book at the precinct and "picked out Photo#2 as [t]he Shooter-Ratti" and "stated that she has known him since he was a little kid but never knew his real name." Id. Finally, according to the police report, Jackson was asked but refused to make a statement to the district attorney; she expressed a willingness to talk further to the assigned detective but "would not come forward as a witness." Id.

At trial, two eyewitnesses, both cooperators, offered the jury detailed accounts of the planning, commission and aftermath of the murder and identified both Riley and Brown as shooters, and Brown as the killer. See Tr. at1284-1302 (testimony of Kirk Lyons, a Los Angeles drug supplier to the Nineties Posse); Tr. at 2423-31 (testimony of Riley's driver Bucknor). Petitioners believe that a jury presented with Jackson's statement would have had reasonable doubts about the credibility of the two government cooperators with respect to their accounts of the murder of Walters and, by extension, the entirety of their inculpatory testimony.

At the Rule 33 stage, where this claim was first raised, Riley's counsel explained in an opposing affidavit that co-counsel (Brown's attorney Stern) and he were aware of the exculpatory lead and had engaged investigators to locate and interview Jackson but that, despite diligent efforts, she could not be found. Ginsberg Aff., sworn to August 16, 1999 at ¶¶4-5. In light of counsel's statement, the Court's own first-hand observation of the strength and credibility of Bucknor's and Lyons's testimony, and the fact that Jackson had declared her firm refusal to speak

13

to the District Attorney or testify at trial, the Court rejected the ineffectiveness claim. Even if Jackson had been found, the content and value (to the defense) of her testimony remained a matter of pure speculation.

Assuming without deciding that this Court's resolution of this claim at the Rule 33 stage does not serve as a procedural bar to its re-assertion here, the Court nevertheless cannot ignore the fact that no new facts or law have been presented that should cause the Court to have a different view of the matter now than at the Rule 33 juncture. Thus, for 2255 purposes the Court readily concludes that counsel's diligent but unsuccessful effort to locate Jackson was not deficient performance, <u>Strickland,</u> 466 U.S. at 690 ("strategic choices made *after thorough investigation* of law and facts relevant to plausible options are virtually unchallengeable") (emphasis added), and even it was, given the strength of the Bucknor's and Lyons's testimony, petitioners have not shown that that Jackson's unavailability as a trial witness caused "a breakdown in the adversary process that renders the result [in their trial] unreliable." <u>Strickland</u>, 466 U.S. at 687

Despite lacking any new facts or law to assert, petitioners have brought additional *arguments* to their claim involving Jackson. They now contend that counsel was ineffective for failing to request that Jackson be declared "unavailable" within the meaning of Fed. R. Evid. 804(a)(5) so that her hearsay statement could be admitted to the jury under that provision. The government concedes Jackson's unavailability within the meaning of Rule 804(a)(5) but argues, and the Court agrees, that that is only half of the admissibility equation; Jackson's statement would then have to fall within one of the 804(b) categories of hearsay rendered admissible by the declarant's unavailability, and it does not.

In reply, however, petitioners assert that Rule 804 itself should not end the analysis and that "[i]t is simply inconceivable that counsel could be deemed effective where he fails" in some way

14

to inform the jury that someone other than Brown or Riley had been "positively identified" as the killer of Mark Walters. Riley Reply Br. at 6. Petitioners specifically argue that counsel could and should have sought to introduce Jackson's statement by calling Detective Daily (the officer who took the statement); Daily was not called by the government but in theory was available to the defense.

Through the distorting lens of their concurrent life sentences, Jackson's statement, however dwarfed by the government's behemoth case against petitioners, understandably looks like the seed from which conviction-vacating doubt might grow. The reality, of course, is quite the contrary.

Counsel's decision not to call Detective Daily may well reflect a prudent strategic decision: by including Jackson's unwillingness to speak to the District Attorney, the statement itself arguably undermines its own credibility, and by calling Detective Daily, the defense would open him up to cross-examination that might further expose reasons to discredit the absent Jackson's statement, or to call attention to the absence of comparable evidence with respect to the five other charged murders, and thus cause the apparent smoking gun to backfire. See Lynn v. Bliden, 443 F.3d at 247 (acts or omissions of counsel are considered "objectively unreasonable *only if there was no tactical justification* for the course taken").

2. Petitioners next complain that attorneys failed to secure the testimony of Paul Demontaangnac who, in their opinion, would have corroborated Jackson's account. In his interview with the police, Demontaangnac stated that he was at the Oasis Bar during the killing of Mark Walters and that he "did not see who shot the person in the back of the club," but he did recognize Wayne Page, also known as "Ratti," from a photo spread and identified him as a bigshot who regularly hangs out at the Oasis Club and was there at the time of the shooting. This Court

15

denied this exact claim in petitioners' Rule 33 motion and has been presented with no fact, law, or argument to occasion a different view of the matter. As was made clear at the Rule 33 stage, Demontaangnac did not claim to have actually witnessed the shooting, so any failure to locate him cannot be considered an unconstitutional investigatory failing by counsel.

Petitioners, however, seize on a sentence from the government's brief in opposition to the Rule 33 motion, and argue that Demontaangnac's absence prejudiced them because the government acknowledged that "Demontaangnac's statement might have acquired some relevance had Jackson testified consistently with what she told the police." Gov. Mem. in Opp. to Riley's Second Mot. for New Trial, at 20. One alleged act of deficient attorney performance (the failure to locate Demontaangnac) cannot be deemed non-prejudicial, they argue, solely in reliance on another act of alleged deficient performance (the failure to locate Jackson). As already discussed, however, petitioners were not prejudiced by the absence of these two threads of evidence, lilliputian in scale and scope relative to the massiveness of the case against them. No reasonable jurist could conclude that even with Demontaangnac's statement, Jackson's statement would have caused the jury to acquit Brown or Riley of the murder of Mark Walters, or any of the charges.

In addition, to the extent that Demontaangnac's testimony might have contributed to the inference that another notorious man of violence was at the Oasis Club that night and could have been responsible for the killing of Walters, the record makes clear that counsel pursued, fairly successfully, several steps toward that end, having subpoenaed several police officers whose reports described the van that fled from the scene and having called two to testify, which established that an unidentified man who could not have been Brown or Riley had fled the van as police pursued it Thus counsel had a basis for and did argue that the fleeing man rather than Brown may have been the actual killer. Ginsberg Aff. at ¶6.

16

3.  Petitioners complain that counsel failed to investigate Sharon Johnson's statement, furnished to counsel in a police report, that she "was told by a friend that she was at Wayne Page's mother['s] apartment when she overheard Ratti state to his mother that 'I had to go over and shoot the pussy again he wouldn't die.'"  Report of Det. Kleinfelder, 11/1/93.  Johnson stated that Ratti did not make reference to any specific case, that she had also spoken to him on the telephone recently and he did not admit to the shooting, but that he did tell her to tell a "PI" (apparently a close associate of murder victim Donovan Brown) "that he was going to be killed."  Id.  Johnson also stated that she "would not assist nor speak to the police."  Id.  Petitioners speculate that interviewing Johnson would have led to the identity of her "friend" and thus to evidence that it was Page, rather than petitioners, who killed Donovan Brown, leader of the Southies Posse (rival and enemy of the Nineties Posse).

Given the number of possible witnesses about whom the defense was given leads, it was not "[un]reasonable considering all the circumstances," Strickland, 466 U.S. at 688, for counsel to have decided to forego a search for Johnson, and even if it was, there was no prejudice, since Johnson herself was not a witness to the crime or to the alleged confession by Page, the statements she reports her friend as having overheard do not refer to any specific killing, and nothing that Page said directly to Johnson connects to any specific homicide.  Whatever vague or speculative value the Johnson statement may have had, it could have done little to undermine the powerful, first-hand accounts by Bucknor and Lyons of the events leading up to and following the ambush-style execution of Donovan Brown, which unequivocally identify petitioners as the source of the fatal spray of bullets.

4.  Petitioners complain that yet another police report that pointed at least an indirect finger toward Walter "Ratti" Page as the possible killer of Mark Walters and Donovan Brown was

17

not investigated. They refer to a report prepared by Detective Murphy stating that he had received a 911 call from an individual identifying himself only as Anthony who stated that a girl he knew had been in the Oasis Club "when the guy got killed." Det. Murphy Rep., 2/23/94. According to Det. Murphy, the girl told Anthony that "the guy that got killed was known as 'Ratti' and . . . the male known as Wayne Page 'aka Ratti' w[]ere arguing over who was the tougher 'Ratti,'" and that "'Ratti' and 'Rocker' and a third guy shot the guy in the back bathroom of the Oasis Club." Id.

The government argues that there are reasons to doubt that a tape-recording of that 911 call would have survived from February 1994, when it was made, to April 1997, when the government first furnished this report (and others relating to the Walters murder) to the defense. Petitioners submit some secondary literature on the subject of the tracing of 911 calls placed from land-line telephones, but the record is otherwise uninformative. Given so numerous a set of embedded uncertainties, it was not "[un]reasonable considering all the circumstances," Strickland, 466 U.S. at 68, for counsel to have chosen to direct their resources and labors toward more promising leads. See Lynn, 443 F.3d at 247 (acts or omissions of counsel are considered "objectively unreasonable only if there was no tactical justification for the course taken"). Likewise, the fact that the jury did not hear remarks of such uncertain value could not have resulted in unconstitutional prejudice. See Strickland, 466 U.S. at 693, 694 (prejudice is the "undermin[ing] [of] confidence in the outcome," not merely "some conceivable effect" on it).

5. Petitioners complain about a minor detail concerning counsel's handling of Bucknor's testimony that is so frivolous it hardly warrants discussion. Bucknor testified that an individual named Byron Foreigner had first brought Riley from Jamaica to the United States, but petitioners complain that counsel failed to impeach Bucknor on this minor point; according to Riley's PSR

18

from a federal prosecution in Florida, petitioners point out, it was Riley's former wife who had arranged for Riley to leave Jamaica. The Court readily finds that the lack of impeachment of Bucknor on this one matter could hardly have affected the jurors' capacity to reliably assess Bucknor's overall credibility. A library of impeachment material had already been introduced, including Bucknor's extensive history of committing serious criminal acts and his admitted role in the violent offenses to which he was testifying.

6. The only ineffectiveness allegation raised here on 2255 that was not already raised and rejected at the Rule 33 stage is petitioners' complaint that their attorneys failed to advise them of the benefits of accepting a plea offer of 20 years. Riley specifically asserts:

> During jury deliberations, trial counsel informed the petitioner that the government had offered a plea of 20 years in exchange for a guilty plea, because it feared that the protracted jury deliberations might be a sign that the jury was either hung or leaning toward acquittal on all counts of the indictment. The petitioner declined the plea bargain because trial counsel did not explain the benefits of accepting a plea bargain versus the realistic probability of acquittal on all counts of the indictment. Had trial counsel done so, the petitioner would have accepted the government's plea offer during jury deliberations.

Riley Pet'n ¶12B. (Brown's separately pleaded allegation is verbatim).

A declaration from Riley's trial counsel gives a different account of the same events. Ginsberg explains that before trial, he urged Riley to consider a plea because the case involved multiple murders, recorded conversations, informant testimony and admissions by a cooperating co-defendant. Ginsberg Aff. at ¶3. Ginsberg further affirms that "no serious plea offer came to fruition prior to trial," and that he frequently advised Riley he faced life imprisonment if convicted of the most serious crimes. Id. Ginsberg explains that

> During the protracted jury deliberations I began a dialogue with the government about a possible plea offer, seeking to determine if the

19

> government would offer a plea under which the petitioner would serve
> no more than 20 years' imprisonment. However, there was never a firm
> offer from the government and as a result there was never a time in
> which I had to explain every possible benefit of a plea to him.

Ginsberg Aff. at ¶4.

Brown's trial counsel declined to comment on petitioners' assertion that a plea offer was made during jury deliberations, but the government's lead trial counsel confirms that while the topic of a plea was broached during deliberations, no offer was made:

> While I was not privy to counsels' conversations with their clients,
> and therefore do not know what the petitioners were told by counsel, any
> plea discussions with the defense were conducted by myself, as the
> [AUSA] with authority to convey plea offers. The government made no
> plea offer during trial. After jury deliberations had begun, [Brown's
> counsel Stern] suggested a plea [] sentence of 20 years. On behalf of
> the government, I rejected the suggestion, and there were no other
> conversations concerning a possible disposition during the trial.

Decl. of AUSA Sameul Buell, 12/19/03, at ¶3.

Petitioners zealously argue that their own assertions and those of the government and counsel create a hearing-worth conflict. See 28 U.S.C. §2255(b) ("[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto"). The Second Circuit's recent construction of 2255(b)'s hearing requirement controls the question. United States v. Puglisi, 586 F.3d 209 (2d Cir. Nov. 13, 2009). Explaining both 2255(b)'s mechanics and its purpose, the Court observed that "the procedure for determining whether a [2255] hearing is necessary is in part analogous to, but in part different from, a summary judgment proceeding." Puglisi, 586 F.3d at 213. A critical difference, relevant here, is that "a district court need not assume the credibility of factual assertions, as it would in civil cases, where the assertions are contradicted by the record in the

underlying proceeding." Id. at 214. Particularly "when the judge that tried the underlying proceedings presides over the Section 2255 motion, a less-than-full-fledged evidentiary hearing may permissibly dispose of claims where the credibility assessment would inevitably be adverse to the petitioner." Id.

Puglisi also authorizes the district court to reject without a hearing a class of 2255 claim that the Circuit describes as "generic." Id., 586 F.3d at 214 (the defendant's assertion that his trial counsel prohibited him from testifying is "a claim generic to all defendants who have not taken the stand in their defense at trial"). Petitioners' assertion that they would have accepted a plea but for some shortcoming in counsel's advice is, in this Court's view, just such a "generic" claim, as it is asserted by nearly every defendant who, to his regret, foregoes a possible plea. With respect to such "generic" claims, Puglisi holds that "trial judge is [ ] in a position, based on the knowledge gained in the underlying criminal proceeding and on his [ ] role as trier of fact in the habeas proceeding, to hold that the particular petitioner ha[s] no chance of overcoming counsel's detailed explanation." Id. Provided the determination is based "on all relevant circumstances," id. at 216, the Court may reject as incredible even a petitioner's sworn affidavit. Id. at 215-16.

Having presided over petitioners' seven-week trial, and based on the submissions of petitioners, Riley's counsel, and the government's lead trial attorney, the Court determines that no hearing is required. The submissions unquestionably establish that there occurred *some* conversation between the defense and the government while the jury was deliberating but that no firm offer was made. A hearing at which each declarant merely reiterates his written submission will accomplish nothing. Based on the totality of circumstances, the Court concludes that petitioners have "no chance of overcoming" the sworn assertions by counsel and the government that no offer was actually made. Puglisi, 586 F.3d at 214. Petitioners' claim that they rejected a

plea late in the game because counsel inadequately explained the plea's advantages, viewed

against the credible proof that no such plea materialized, fails to establish either deficient

performance or prejudice under Strickland.[7]

## IV.    RILEY'S INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL CLAIM

Riley claims that his appellate attorney Alan Futerfas rendered constitution124 F.ally

ineffective assistance because he did not supplement the brief already filed with the Second Circuit

to include the attacks on trial counsel that were raised in the Rule 33 motion, which this Court

denied while petitioners' appeal was pending.   The Court's conclusion, in the foregoing section of

this opinion, that none of the resurrected Rule 33 trial ineffectiveness grounds has merit forecloses

any showing of the necessary Strickland prejudice resulting from appellate counsel's decision not

to pursue them.   See generally Jones v. Barnes, 463 U.S. 745 (1983) (appellate counsel does not

have a "constitutional duty to raise every nonfrivolous issue requested by a defendant").

## V.    BROWN'S CLAIM UNDER *UNITED STATES V. BOOKER*

Brown's motion for leave to amend his 2255 application to add a claim under United States

---

[7] For similar reasons, the Court views with suspicion and readily denies Riley's motion for leave to amend his 2255 petition to add a claim that he was denied his right to testify at trial by virtue of counsel's alleged failure to advise him that he had a right to do so.   See Brown v. Artuz, 124 F.3d 73, 74 (2d Cir.1997) ("We conclude that . . . the two-part test established in *Strickland* . . .should be used to assess a [petitioner's] claim that defense counsel rendered ineffective assistance by preventing him from testifying or at least failing to advise him concerning his right to testify."), cert. denied, 522 U.S. 1128 (1998).   Riley first made this claim in his Rule 33 motion, which the Court denied, and the claim is as deficient now as it was then: Riley offers nothing to corroborate his mere allegation of mis-advice, and continues to refrain from disclosing what he would have said had he testified.   See Polanco v. United States, 2005 WL 1229255, *2 (E.D.N.Y. May 23, 2005) (Johnson, J.) ("As other courts have noted, without more, a [petitioner's] barebones assertion that his attorney told him not to testify in his own defense, even if that assertion is made under oath, has been held to be insufficient" to justify relief) (internal quotation marks and citations omitted).   Without any showing that his testimony would have established a defense to the formidable government case against him, Riley cannot show that he was prejudiced under Strickland.   See, e.g., Brown v. Artuz, 124 F.3d at 80.

v. Booker, 543 U.S. 220 (2005), is denied. Brown claims that his sentence was based in part on conduct not specifically determined by the jury's verdict, such as drug quantity, premeditation, and leadership role. Brown cannot avail himself of the Booker decision, however, because his conviction became final on October 7, 2002, but Booker was not issued until January 12, 2005, and Booker lacks retroactive reach. See Guzman v. United States, 404 F.3d 139, 141 (2d Cir.), cert. denied, 546 U.S. 1035 (2005). Because it would be futile to add a Booker claim, the motion seeking leave to amend is therefore denied.

## VI.    BROWN'S *CRAWFORD* CLAIM

Brown's motion for leave to file a second amendment to his section 2255 application is denied as futile. The motion seeks to raise the additional claim that Brown's rights under the Confrontation Clause were violated at trial when the government was permitted, over objection, to admit into evidence five tapes of telephone calls to the 911 emergency police dispatcher that took place in the aftermath of the Mark Walters homicide at the Oasis Bar. The callers, claiming to be witnesses to the homicide, did not identify themselves, and Brown's counsel objected to their admission on the ground that they were hearsay and did not qualify as excited utterances because they were made after a substantial amount of time had passed.

Brown concedes that he raised this claim on direct appeal and that it was rejected by the Second Circuit, but argues that he is entitled to re-litigate it because the Supreme Court's decision in Davis v. Washington, 547 U.S. 813 (2006), represents an intervening change in the law (within the meaning of Davis v. United States, 417 U.S. at 334). Brown's efforts to re-litigate his 911 claim, however, are futile. First, Brown apparently misapprehends Davis v. Washington, for it holds that 911 calls ordinarily are *not* "testimonial" within the meaning of Crawford v.

23

Washington, 541 U.S. 36 (2004) and thus their admission does *not* violate the Confrontation Clause as interpreted by Crawford. Davis v. Washington, 547 U.S. at 826-28. Second, even if language in Davis could support Brown's 911 claim, he could not rely on it here because Crawford and Davis are not retroactive and thus not applicable on collateral review. Whorton v. Bockting, 549 U.S. 406 (2007).

## VII.  RILEY'S *WHITLEY* CLAIM

Riley was convicted of four counts charging violations of 18 U.S.C. §924(c), carrying and using a firearm in connection with a crime of violence. See Counts 5, 8, 21 and 30 (S-5). He seeks leave to amend his 2255 petition to add a claim challenging the sentences imposed on those counts in light of United States v. Whitley, 529 F.3d 150, reh'g denied, 540 F.3d 87 (2d Cir. 2008) and United States v. Williams, 558 F.3d 166, 168 (2d Cir. 2009). In Whitley and Williams, the Second Circuit made clear that, under an "except" clause added in the 1998 amendment, the *consecutive* minimum penalties long provided for in the statute became *in*applicable to defendants subject to a higher minimum sentence under any other provision of law for conduct that is part of the same criminal transaction as the firearms offense. Riley was sentenced to terms of five years on Count 5, to run consecutively to any other term imposed, and to terms of twenty years each on Counts 8, 21 and 30 to run concurrently to each other but consecutive to any other term imposed.

Riley's request to add a Whitley claim is denied, however, because Riley was indicted and convicted for conduct committed in 1993, 1994 and 1995, and at that time, section 924(c) did *not* contain the new "except" clause that Whitley construed. See, e.g., Persico v. United States, 2009 WL 4709533, *1 (E.D.N.Y. Dec. 9, 2009) (Amon, J.) ("Although the Circuit has not yet addressed

the retroactivity of the <u>Whitley</u> holding to cases on collateral review, the Court need not analyze that issue here because the <u>Whitley</u> and <u>Williams</u> decisions are not applicable . . . [because petitioner's] 924(c) conviction was based on an earlier version of the statute which did not contain the prefatory language underlying the rule in <u>Whitley</u>").[8]

## CONCLUSION

The applications for relief under 28 U.S.C. § 2255 in *Donald George Brown v. United States, 03 CV 3909* and in *Derrick Riley v. United States, 03 CV 4371* are both denied in their entirety and the petitions are dismissed. Each of the several motions for leave to amend the 2255 petitions is likewise denied. Neither Brown nor Riley has "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), so a certificate of appealability will not issue in either case. The Clerk of Court is directed to close both matters. . SO ORDERED.

Dated: Brooklyn, New York
     June 22, 2010                         s/ Judge Raymond J. Dearie

                                          RAYMOND J. DEARIE
                                          United States District Judge

---

[8] To date, the Circuit has remarked upon the question only in an unreported, one-paragraph summary order. <u>See</u> <u>Nevado v. United States</u>, 09-0372-op (Feb. 25, 2009, issued as mandate Mar. 18, 2009) ("The new rule of law Petitioner relies on, *United States v. Whitley*, 529 F.3d 150 (2d Cir. 2008), is n[ot] a new rule of constitutional law made retroactive by the Supreme Court").